IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| BILL O. HUFF, | ) | Civil No. 04-6297-JE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


Alan Stuart Graf
Kimberly K. Tucker
1020 S.W. Taylor Street, Suite 230
Portland, OR 97205-2555

    Attorney for Plaintiff

Karin J. Immergut
U.S. Attorney
Craig J. Casey
Asst. U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

Leisa A. Wolf
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

    Attorneys for Defendants

JELDERKS, Magistrate Judge:

Plaintiff Bill Huff brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits under 42 U.S.C. § 416.  The Commissioner's decision should be affirmed.


## Procedural Background

Plaintiff filed an application for disability insurance benefits on August 30, 2002, alleging that he had been disabled since February 1, 2002, because of degenerative disc disease.  After his application was denied initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge (ALJ).

A hearing was held before ALJ William Stewart on March 24, 2004.  Plaintiff and Vernon Arne, a Vocational Expert (VE), testified at the hearing.

In a decision issued on April 26, 2004, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act (the Act).  That decision became the final decision of the Commissioner on June 21, 2004, when the

FINDINGS & RECOMMENDATION - 2

Appeals Council denied plaintiff's request for review. Plaintiff seeks review of that decision in the present action.

## Standards

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771,

772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

<u>Factual Background</u>

I. <u>Plaintiff's Background and Testimony</u>

Plaintiff was born on December 30, 1952, and was 51 years old at the time of the hearing before the ALJ. He completed high school, and has past relevant work experience as the owner of a video rental store.

On a disability form plaintiff completed when applying for benefits, plaintiff indicated that he owned a retail video rental business, which he had operated from January 1987 until February 2002. Plaintiff indicated that he had worked 8 to 10 hours per day, seven days a week until February 2002, and that he had worked 2 to 4 hours per day, 3 or 4 times per week since then. At the hearing, plaintiff testified that he was currently working about 15 to 17 hours per week, during which time he rented out and checked in movies, did bookkeeping and ordering, and did "just all the basic stuff that I need to do, business calls." He added that he could not climb ladders, go onto the roof, or perform repair work.

Plaintiff testified as follows concerning the symptoms upon which his disability claim is based: Since 2002,

plaintiff has suffered "back attacks" that are so severe that
they "literally put [him] on his knees."  During a "very
vicious" attack some six weeks before the hearing, plaintiff
fell and sprained his ankle.  Plaintiff is very careful in his
movements.  Though he manages his medications to decrease the
likelihood of a "back attack," he still suffers an attack or
two per week.  After an attack, plaintiff cannot get up for
five to fifteen minutes.  Plaintiff needs three or four days
to recover from an attack, during which time he cannot work.
Plaintiff is in constant back pain, even if he is not
experiencing or recovering from a back attack.  He has
difficulty going from a sitting to a standing position, and
cannot stand up straight for a couple minutes after he gets
up.  Plaintiff drives only in the small town he lives in, and
his wife does the driving when they need to go further.
Sleeping is plaintiff's "torture chamber."  Plaintiff sleeps
only one and a half to two hours at a time, even with pain
medications.  He has to get up by 3:30 to 4:30 a.m. because
the pain worsens during the night.

     Back pain forces plaintiff to leave work abruptly on many
occasions.  At those times, plaintiff's oldest daughter either
comes to work at the store, or plaintiff closes the store.
Plaintiff usually misses work or leaves work abruptly because
of pain a couple times a week.  However, he can sometimes go
for four to six weeks without doing so.

Plaintiff has tried both long and short-acting pain medications for his back pain.  Though medications help ease the pain somewhat, they also reduce his coordination, slow his thinking, and affect his eyesight.  The Methadone that plaintiff used for a time nearly killed him three times, and caused one episode of respiratory failure.  Acupuncture treatments provided better pain relief, but plaintiff had to discontinue treatments after a few sessions because his insurance would not pay for them, and plaintiff lacked the resources to pay on his own.

About a month before the hearing, plaintiff suffered a hearing loss of unknown cause.  At the time of the hearing, plaintiff had no hearing in his right ear, and had experienced episodes during which the hearing in his left ear would "just slowly fade away" to zero, then gradually return to a baseline which plaintiff estimated was about 15% of normal.  Plaintiff feared that the hearing loss resulted from "Vicodin poisoning," and testified that his doctor had told him someday "there is going to be [a] time when that fading is going to go away and it will not come back."

II. <u>Medical Evidence</u>

A. <u>Treating Physicians</u>

1. <u>Dr. Diana Barron</u>

On May 6, 2002, plaintiff reported back and bilateral leg pain during a visit to Diana Barron, M.D., his treating physician.  Plaintiff reported that this pain had been triggered by digging a ditch approximately six weeks earlier.  Dr. Barron noted that plaintiff had experienced "multiple episodes of back pain in the past," which usually resolved if plaintiff rested for a few days and took Ibuprofen.  Dr. Barron indicated that plaintiff's recent "flare up" was "suggestive of some L5 or possibly S1 radiculopathy," and prescribed a six-day course of Prednisone.  She found that plaintiff's back flexion was limited to 60%, that plaintiff's straight leg raise test was negative, and that plaintiff moved easily and had no muscle spasms.  Dr. Barron added that plaintiff's "[t]ransient emotional disturbance," which she had noted during a visit in April 2002, had improved.

On May 17, 2002, Dr. Barron noted that plaintiff's back flexion was limited by hamstring tightness, and that plaintiff had "some tenderness in the back, lower lumbar area, with flexion."  However, extension was unremarkable, and there was no significant tenderness to palpation or palpable muscle spasm.  Dr. Barron scheduled plaintiff for a lumbar MRI.

The MRI, which was performed on May 30, 2002, showed disc height loss and disc desiccation at L4-5 and L5-S1, and substantial end plate changes.  Spinal alignment was intact. The MRI showed a slight bulge at L3-4 that flattened the anterior thecal sac, a left-sided disc protrusion at L4-5 with moderate proximal neuroforaminal narrowing, and a small disc bulge at L5-S1 with deformation of the anterior thecal sac but no stenosis or neuroforaminal narrowing.

During a visit to Dr. Barron on June 7, 2002, plaintiff reported that he was suffering "unimaginable" back pain, and that he had fallen 4 times, including a fall down the stairs when his "legs didn't move."  Dr. Barron increased the doses of Trazondone and Neurontin prescribed, and prescribed Vicodin as well.  In her notes of a visit on June 14, 2002, Dr. Barron indicated that plaintiff's back pain was "really difficult," and that plaintiff was becoming "very discouraged."  Dr. Barron noted that Dr. Kast had evaluated plaintiff, and "did not feel there was anything that was amenable to surgical solution."

During a visit to Dr. Barron on July 8, 2002, plaintiff reported that his pain was "the equivalent of a torture chamber every night."  Dr. Barron noted that plaintiff was "moving fairly easily," and that his "[l]ower extremity neurologic is normal except for possibly slightly weak

extensor hallucis longus and gastrocsoleus unit on the left."
The straight-leg raising test was negative.

Dr. Barron referred plaintiff to Dr. Allen Brooks for neurodiagnostic studies. Dr. Brooks summarized the results of plaintiff's physical examination as follows: "5/5 strength. Symmetric reflexes. Down going toes. Normal sensation. Negative [straight leg raising]." Nerve conduction studies showed "trace positive" waves which Dr. Brooks thought raised "the question of an irritative lesion at L-4." Dr. Brooks characterized the findings of the conduction study as "fairly minimal . . . ."

On August 6, 2002, plaintiff told Dr. Barron that Methadone had fully relieved has back pain, but that he had stopped taking the drug because it had "almost killed" him. Dr. Barron noted that plaintiff was "slightly tearful" and was expressing thoughts of suicide.

During a visit to Dr. Barron on August 20, 2002, plaintiff reported that Fentanyl patches eased his pain, which was averaging 3 on a scale of 10, without significant side effects. Plaintiff said that he was back at work, and left early 50% of the time. Plaintiff reported that he was "sleeping OK," and asked about disability. Dr. Barron opined that plaintiff's pain was "consistent with an L-4 radiculopthy."

In her record of a visit on September 6, 2002, Dr. Barron noted that plaintiff was "cheerful and is beginning to seem hopeful." Dr. Barron indicated that plaintiff's back flexion was "limited because of pain," that tenderness to palpation was minimal, a straight leg raising test was negative, patellar and Achilles reflexes were normal, and that extensor hallucis longus strength was normal. She diagnosed back pain "with likely lower extremity radiculopathy."

During a visit on October 7, 2002, Dr Barron observed that plaintiff was "moving fairly comfortably," exhibited a brighter affect, and showed no significant tenderness to palpation or muscle spasm.

Plaintiff indicated that he was much more comfortable after receiving a steroid injection on November 11, 2002. In her record of a visit four days later, Dr. Barron noted that plaintiff appeared to have "had significant benefit from the epidural injection." Dr. Barron noted that plaintiff was "tearful during the entire visit," and she prescribed Zoloft and Trazodone for depression.

In her record of a visit on December 2, 2002, Dr. Barron noted that plaintiff's affect and depression had "improved significantly." Dr. Barron's record of plaintiff's visit on December 27, 2002, indicates that plaintiff's depression had stabilized, and that plaintiff was only mildly depressed. Dr. Barron noted that plaintiff was "moving fairly easily."

In her record of a visit on January 21, 2003, Dr. Barron indicated that there was an "emotional component" to plaintiff's left lower extremity radiculopathy.  She also indicated that the symptoms of plaintiff's "depression with situational disturbance" were "partially responsive to medication."

During a visit on March 17, 2003, plaintiff told Dr. Barron that the nighttime was "almost intolerable" because of his back pain.  Dr. Barron noted that plaintiff was "moving fairly easily."

During a visit on June 2, 2003, plaintiff told Dr. Barron that some days were "not so bad," but that nighttimes were "still pure hell."

During a visit on September 2, 2003, plaintiff told Dr. Barron that he had "had a great summer at work," and had managed to work every day.[1]  Dr. Barron indicated that plaintiff's pain had "improved a bit."

On October 7, 2003, plaintiff told Dr. Barron that Methadone was "killing him," and that he experienced "waves" of pain in his joints.  Dr. Barron observed no joint abnormalities.

---

[1]In his reply memorandum, plaintiff contends that this notation in Dr. Barron's records actually refers to plaintiff's wife.  I disagree.  In the context of Dr. Barron's hand-written notes of this visit, it appears that the reference was to plaintiff's own work.

In her records of plaintiff's visit on November 7, 2003, Dr. Barron noted that plaintiff had experienced "impressive results" with acupuncture.  Plaintiff rated his back pain as 1 on a scale of 10 since the first treatment.  Plaintiff reported that numbness in his hands had resolved since the first treatment, and that numbness in his left thigh resolved completely by the third visit.  He also reported that he had driven 600 miles without a "flare-up."

During a visit on November 17, 2003, plaintiff told Dr. Barron that all of his pain had improved, though he still needed some narcotic drugs.  Dr. Barron noted that plaintiff had experienced an "excellent result" with acupuncture.

During a visit on January 12, 2004, plaintiff stated that back pain had not awakened him during the night for several months.  Dr. Barron noted that plaintiff had experienced "good improvement with acupuncture," though his symptoms persisted "at a fairly severe level. . . ."

In her record of a visit on January 20, 2004, Dr. Barron noted that plaintiff had not been able to continue acupuncture treatments because of financial problems, and that plaintiff reported that his lower legs felt like they had "been beaten with a baseball bat" during the night.  Plaintiff reported that he experienced leg pain during the daytime only if he sat for prolonged periods.

In the record of a visit on February 3, 2004, Dr. Barron noted that plaintiff showed "promising improvement with Neurontin," and that plaintiff reported that he was "getting right to sleep" for the first time since November of 2003. Plaintiff also reported that back pain still limited his activity significantly.

In late February, 2004, plaintiff reported a sudden loss of hearing and severe pain in his ears. Testing long-standing severe high-frequency hearing loss in plaintiff's left ear and a sudden moderately severe to moderate sensorineural hearing loss in the right ear. Tests indicated that plaintiff's left ear word recognition score was 84%, and that his right ear word recognition score was 92%.

The record of a visit on March 4, 2004, indicates that plaintiff's back and leg pain had showed "good improvement" with the use of Neurontin. Plaintiff reported severe pain in his right ear.

2. Dr. Henry Holmes

Plaintiff saw Dr. Holmes several times between July 15, 2002, and February 12, 2003. During the first visit, Dr. Holmes found no radicular symptoms, but noted decreased range of motion. His diagnosis included degenerative disc disease from L4 to S1, possible radiculopathy with atypical features, and chronic pain syndrome with depression "and

significant loss of ADLs."  Dr. Holmes explained "the vicious
cycle of chronic pain," and tried to "reassure [plaintiff]
that his back is basically sound."  He began treating
plaintiff's pain with Methadone.  In his record of a visit on
July 24, 2002, Dr. Holmes noted that plaintiff was "fairly
ecstatic" with the results of taking Methadone, and had
reported that he had "been able to function" and regained his
sense of hope.

During a visit on August 14, 2002, plaintiff described a
"frightening" episode related to Methadone use.  Plaintiff
reported that he "became over-sedated, lost 12 pounds, could
not breath, had blurring vision, constipation, urinary
retention, severe pain, and sweating . . . ."  Dr. Holmes
noted that plaintiff's back was "stiff with significant
protective guarding," but that plaintiff had no "true muscular
spasms."  Dr. Holmes opined that plaintiff was probably
"temporarily totally disabled from gainful employment based on
his chronic pain syndrome physical and emotional impact."  He
added that he expected plaintiff to improve "with a broad
chronic pain management program."  Dr. Holmes prescribed a
Fentanyl patch, and recommended that plaintiff participate in
a pain treatment program.

In a letter dated November 21, 2002, Dr. Holmes noted
that an epidural steroid injection had "almost resolved the
pain in [plaintiff's] hips and legs," and that plaintiff's

"pain is better-controlled than ever, yet his depression is severe."  In a letter dated December 5, 2002, Dr. Holmes stated that plaintiff was "fairly ecstatic," and thought that he had "'turned the corner.'"  Plaintiff reported that he "finds himself resting and relaxing better, he is walking on the treadmill and outside."  Dr. Holmes opined that plaintiff had achieved "[g]ood control of intractable pain with low dose Methadone."  Plaintiff's depression had improved markedly.

On February 12, 2003, Dr. Holmes reported that "plaintiff is in a down-turn and describes his suffering dramatically." Dr. Holmes noted that plaintiff had "marked unexplainable improvement at times," that plaintiff had three days of marked relief from steroid injection, after which his pain was "quickly returning," and that he rated his pain as 8-9 on a scale of 10 despite the use of Methadone.  A straight-leg raising test was negative, and a lower extremity motor, sensory, and reflex exam was "intact."  Dr. Holmes opined that psychological factors were affecting plaintiff's physical condition, and noted plaintiff's resistance to psychological intervention.


B. Examining Physicians

1. Dr. John Kast

Dr. Kast, a neurological surgeon, examined plaintiff on June 11, 2002.  Dr. Kast noted that plaintiff's affect,

strength, reflexes, and gait were normal, but he had
tenderness in his back muscles and decreased sensation in
lumbar dermatomes, including L2, L3, and L4.  An MRI scan
showed "average degenerative changes which are more pronounced
at the L4-5 than at L5-S1."  Dr. Kast characterized
plaintiff's symptoms as "a bit out of proportion" to what he
observed on the MRI, and recommended lower extremity nerve
studies to detect the presence of radiculopathy.  After those
studies were concluded, on August 30, 2002, Dr. Kast opined
that the pain plaintiff reported was "far out of proportion to
the MRI changes."  Dr. Kast noted the possibility of "an
irritative lesion involving L4," but indicated that the
studies were "essentially inconclusive."  He did not think
plaintiff "would be a good surgical candidate."

2. <u>Dr. Todd Lewis</u>

     Dr. Lewis examined plaintiff on September 16, 2002.
Dr. Lewis noted that X-rays showed spondylosis at L4-5 and
L5-S1, and that the MRI showed "a little bit of foraminal
encroachment, but not a lot."  He also noted that there were
"a lot of reactive bone changes at both disks," and
recommended epidural steroid injections and physical therapy
or treatment at a pain center.  Dr. Lewis noted that a
cortisone injection to plaintiff's right hip had given "him a
lot of relief."

C. Reviewing Physicians and Psychologists

Karen Bates-Smith, Ph.D., and Frank Lahman, Ph.D, state agency psychologists, determined that plaintiff had depression, but that this impairment was not severe.

M. Westfall, M.D., and L. Jensen, M.D., state agency physicians, opined that plaintiff could perform light work that included occasionally climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling, but that plaintiff should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and vibration.

## Vocational Expert's Testimony

The VE testified that plaintiff's past relevant work was that of a retail manager, a skilled position performed at the light level of exertion.

The ALJ posed a hypothetical describing a 51 year-old individual with a high school education and plaintiff's work experience who

> is limited from lifting or carrying more than
> 10 pounds frequently with an occasional 20 pound
> maximum.  He is limited to occasional ladder
> climbing, stooping, kneeling, crouching and
> crawling.  He needs to avoid dangerous hazards.
> And he has limited tolerance for extreme cold,
> vibration, [and] fumes . . . .

The VE testified that an individual described in the hypothetical could perform plaintiff's past relevant work. When the ALJ added a moderate limitation in following detailed

instructions to the hypothetical, the VE testified that the individual could not perform plaintiff's past relevant work. However, he said that a person with this additional limitation could work as a marker, a light level unskilled position, or as an order puller, a light exertional level, semi-skilled position. The VE testified that plaintiff had transferable skills in cataloging and organizing retail products and an ability to use inventory sheets, keep records, and work with the public that would allow him to work as a cashier. The VE further testified that a person who missed work more than two times a month because of back pain would not be able to sustain employment in any position.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9ᵗʰ Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds

that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## ALJ's Decision

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged date of the onset of his disability.

At the second step, the ALJ found that plaintiff had "degenerative disc disease with bulging and disc protrusion with neuroforminal narrowing at L4-5, without such narrowing at L5-S1, without canal stenosis, with intact neurological

examination, and with minimal findings on electromyographic examination . . . ."  He found that this impairment was "severe."

At the third step, the ALJ found that plaintiff's impairments did not meet or equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.

At the fourth step, the ALJ found that plaintiff could perform his past relevant work as a retail manager.  He further determined that, though plaintiff could not perform the full range of light work, he retained the residual functional capacity to perform some light work, subject to the limitations set out in his hypothetical to the VE.

At the fifth step, the ALJ found that plaintiff could perform a significant number of jobs that exist in the national economy.  As examples of these jobs, the ALJ cited work as a marker, an order puller, and a cashier.  Based upon his findings at the fourth and fifth steps, the ALJ found that plaintiff was not under a "disability" as defined in the Act at any time through the date of his decision.

In finding that plaintiff could perform his past relevant work and other light exertional level work, the ALJ found that plaintiff's description of his symptoms and limitations was not fully credible.

<u>Discussion</u>

Plaintiff contends that the ALJ erred in finding that his depression, pain disorder, and hearing loss are not severe, in failing to fully develop the record concerning his mental impairments, in finding plaintiff was not fully credible, and in presenting the VE a hypothetical that did not include all of his limitations.

I. <u>Failure to find plaintiff's depression, pain disorder, and hearing loss severe</u>

A. <u>Depression</u>

An impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). In order to qualify as "severe," an impairment must be expected to continue at a "severe" level for a continuous period of at least 12 months, or be expected to result in death. 20 C.F.R. § 404.1509. A claimant bears the burden of establishing that an impairment is severe. 20 C.F.R. § 404.1512(a).

In concluding that plaintiff's depression was not "severe" within the meaning of the Act, the ALJ observed that the record indicated that the period during which his depressive symptoms caused "functional loss" was "comparatively brief." In support of this observation, the ALJ cited Dr. Holmes' notes for October and November 2002,

cited more recent references to plaintiff's "good mood," and
noted that plaintiff had minimized his mental problems at the
hearing.  The ALJ also noted that plaintiff had not required
professional treatment for depression, and that his
"vocational ability" had not been "even minimally limited over
12 months."

The ALJ's conclusion that plaintiff's depression was not
severe is supported by substantial evidence in the record.
Though there were periods during which it appears that
depression significantly affected plaintiff's ability to do
basic work activities, there is substantial evidence
supporting the ALJ's conclusion that plaintiff's depression
was transient, and did not continue for any 12-month period.
Plaintiff testified that he was never affected by "serious
depression," and the records of plaintiff's treating
physicians indicate that, after periods of depression lasting
a few weeks or months, plaintiff's mood and affect
consistently improved.


B. Pain Disorder

In reaching his conclusion that plaintiff did not have
a severe pain disorder, the ALJ noted that, though Dr. Holmes
had described plaintiff's pain disorder as "poorly
elucidated," no mental health specialist had diagnosed a
chronic pain disorder.  He added that, even if it was possible

that plaintiff had a pain disorder, "no pain disorder has been sufficient to substantially limit the claimant's documented level [of] activity, as is shown [in the succeeding portion of the opinion]."

The ALJ's conclusion that plaintiff did not have a severe pain disorder is supported by substantial evidence in the record. Though Dr. Holmes did at one point opine that plaintiff was "probably temporarily totally disabled from gainful employment based on his chronic pain syndrome physical and emotional impact," he expected plaintiff "to improve with a broad chronic pain management program." There is evidence supporting the conclusion that this prediction was accurate: Four months later, Dr. Holmes noted that plaintiff indicated that he had "turned the corner," described himself as "active, clear of mind and spirit," and "was out doing things," including "walking on the treadmill and outside." Dr. Holmes indicated that plaintiff had "good control" of his pain, which was described as low level.


C. <u>Hearing Loss</u>

In finding that plaintiff's reported hearing loss was not severe, the ALJ noted that an audiologist who examined plaintiff in February 2004 indicated that tests showed a longstanding and severe high frequency loss in plaintiff's left ear, and a sudden moderate/severe loss in the right ear.

The ALJ noted that, although the audiologist referred to a long-standing hearing loss, there was no indication of any functional hearing problem until plaintiff experienced a sudden loss of hearing in February 2004, which was only a month before the hearing.  The ALJ found that there was no evidence that plaintiff had suffered a permanent hearing loss, and no documentation of a functional impairment that had lasted or could be expected to last 12 continuous months. Because substantial evidence in the record supported his conclusion that plaintiff had not suffered a hearing loss that caused a functional impairment that had lasted or would last 12 continuous months, the ALJ did not err in concluding that plaintiff's hearing loss was not "severe" within the meaning of Social Security regulations.

II. Development of the record

Plaintiff contends that the ALJ failed to fully develop the record concerning plaintiff's mental impairments and hearing loss.  I disagree.  As the Commissioner correctly notes, an ALJ has a duty to further develop the record when the evidence is ambiguous or is inadequate to allow for proper evaluation of the evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  Here, the record as to plaintiff's mental impairments and hearing was adequate for the ALJ to

properly evaluate their significance and effect on plaintiff's functional capacity.

III. <u>ALJ's Credibility Determination</u>

As noted above, the ALJ's finding that plaintiff could perform his past relevant work and other light exertional level work was based in part on his determination that plaintiff's description of his symptoms and limitations was not fully credible.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because they are unsupported by objective medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) <u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990)(*en banc*). Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Id.</u>, <u>quoting</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the

testimony that is not credible and the evidence that undermines the claimant's complaints.  <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

Plaintiff produced medical evidence of an underlying back impairment, and there was no affirmative evidence that plaintiff was malingering.  The ALJ was therefore required to provide "clear and convincing" reasons for rejecting plaintiff's allegations concerning the severity of his symptoms.

The ALJ correctly noted that plaintiff described himself as "crippled by constant and routinely excruciating pain." He supported his conclusion that this description was not credible with clear and convincing reasons.  The ALJ opined that plaintiff's activities were "far in excess of his description" of his symptoms, citing evidence that plaintiff drove most days, cared for a pet, watched television, went to movies, handled financial matters, was able to occasionally prepare meals, and was only "occasionally" limited in his

ability to do routine chores.  The ALJ noted that plaintiff

testified that he experienced constant pain and "back attacks

sufficient to drop him to the ground" once or twice a week,

and that attacks required days of recovery.  He opined that

plaintiff could not have continued to work, as he did, 15 to

17 hours per week, and engage in the other activities noted in

the record, if the symptoms were in fact as serious as

plaintiff alleged.

The ALJ opined that plaintiff's "allegations of acute,

continuing pain in the back" were "barely explained by the

objective medical record."  In support of this observation,

the ALJ noted that, though there was "some indication on the

MRI of June 2002 of abnormalities," there was "no evidence of

herniation or clear-cut neural compromise."  The ALJ noted

that Dr. Kast characterized plaintiff's symptoms as "both

disproportionate to and inconsistent with what he saw in the

MRI study," and that the results of the nerve conduction

studies produced findings referred to in the medical record as

"fairly minimal" and "inconclusive."   Though a claimant's

testimony concerning pain cannot be discounted solely because

of the lack of medical evidence, an ALJ may consider that

factor in making a credibility determination.  <u>Burch v.

Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) (ALJ could consider

evidence that claimant had only mild degenerative disc disease

and lack of apparent disc herniation or nerve root impingement as part of basis for credibility determination).

The ALJ observed that a number of plaintiff's complaints concerning symptoms other than back pain lacked any "medically-determinable cause." These included plaintiff's complaint of a burning skin pain in February 2003, and pain "in every joint" that plaintiff reported to Dr. Holmes. The ALJ noted that Dr. Holmes ruled out fibromyalgia as a source of plaintiff's complaints, that no physician ever diagnosed plaintiff with widespread degenerative arthritis, that there was no documentation of rheumatoid arthritis, and that Dr. Barron's examination of plaintiff's joints was "consistently negative." He added that the record included no other possible explanation for these symptoms. In evaluating plaintiff's credibility, the ALJ could properly conclude that the absence of objective medical evidence for some of the symptoms related to an impairment for which plaintiff complained rendered plaintiff's complaints about symptoms for which there was objective medical evidence less credible.

The ALJ also noted that, despite plaintiff's complaints of crippling back pain, Drs. Holmes, Barron, Lewis, and Kast did not assert that plaintiff was "disabled for Social Security purposes." He noted that Dr. Barron, a treating physician, only referred to plaintiff's sudden onset of hearing loss when provided the opportunity to describe

plaintiff's limitations in March 2004.  He further noted that,
though Dr. Holmes, another treating physician, had described
plaintiff as disabled in August 2002, he thought that the
disability was "temporary," and that plaintiff would likely
improve with treatment.  The ALJ correctly noted that
Dr. Holmes "never reiterated a conclusion of disability, much
less concluded that plaintiff was disabled permanently."

The ALJ cited other aspects of the record as inconsistent
with plaintiff's testimony and allegations concerning the
severity of his symptoms.  In spite of plaintiff's allegations
of crippling pain, his treatment remained conservative, and
plaintiff was "not seen at hospital emergency rooms, as might
be expected of someone with frequently tortuous pain."  In
addition, the ALJ cited evidence in the medical record that
Neurontin and Methadone greatly reduced his symptoms, and
opined that plaintiff's refusal to use "appropriate
medications" because of an alleged concern about addiction not
apparently shared by his treating physicians "suggests that
his symptoms may be in fact less overwhelming than he has
maintained."

The ALJ cited a physician's characterization of
plaintiff's description of his pain as "dramatic" and
plaintiff's apparent exaggeration of his medical condition as
evidence that plaintiff's description of his symptoms was not
wholly credible.  The ALJ noted that, though plaintiff

testified that a neurologist told him he had only a few years to live, there is no indication in the record supporting that statement.  The ALJ cited other examples of apparent exaggeration, including plaintiff's statement to Dr. Holmes that other physicians had told him that his spine was relentlessly worsening, and his assertion to Dr. Lewis that Dr. Kast had told him he had an inoperable condition that would deteriorate and cause dysfunction and disability.  The ALJ concluded that such statements "further bring into question the reliability of [plaintiff's] symptoms as described."

The above reasons for determining that plaintiff's description of his symptoms was not wholly credible are clear and convincing.


IV.  Sufficiency of ALJ's Hypothetical

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health & Human Services, 717 F.2d 443, 447 (9th Cir. 1983)).  The ALJ's depiction of the claimant's limitations set out in the hypothetical must be "accurate, detailed, and supported by the medical record."  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).  If the assumptions included in the hypothetical are not supported by the record,

a VE's opinion that a claimant can work does not have
evidentiary value.  Gallant, 753 F.2d at 1456.

Plaintiff contends that the VE's opinion that plaintiff
could perform his past work and other work in the national
economy lacked evidentiary value because the ALJ's
hypothetical omitted his mental impairments and hearing loss.
He asserts that the ALJ's hypothetical should have included
"concentration difficulties and periods of very low
functioning . . . ."

I disagree.  As noted above, the VE testified that an
individual with the limitations set out in the ALJ's original
hypothetical could perform plaintiff's past relevant work,
which plaintiff was in fact performing part-time during the
alleged period of disability.  The ALJ's findings concerning
plaintiff's residual functional capacity which is reflected in
the initial hypothetical is supported by substantial evidence
in the record, and plaintiff's assertion that the ALJ
improperly omitted concentration difficulties and periods of
low functioning is not supported by the record.  In any event,
when the ALJ added a moderate limitation in ability to follow
detailed instructions, the VE testified that the individual
could perform several other specific jobs in the national
economy.  The ALJ posed hypotheticals that were legally
sufficient, and his ultimate conclusion that plaintiff could
perform those jobs is supported by substantial evidence in the

record.  The ALJ's conclusion that plaintiff was not disabled should be affirmed.

## Conclusion

For the reasons set out above, the Commissioner's decision denying plaintiff's request for disability benefits should be AFFIRMED, and a judgment should be entered dismissing this action with prejudice.

## Scheduling Order

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due July 12, 2005.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 24th day of June, 2005.

/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge